# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CINDY L. STOBBE**
    **Plaintiff,**

  **v.**           **Case No. 20-C-777**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**[1]
     **Defendant.**

---

## DECISION AND ORDER

  Plaintiff Cindy Stobbe seeks judicial review of the denial of her application for social security disability benefits. Plaintiff argues that the Administrative Law Judge ("ALJ") assigned to the case failed to properly assess: (1) the credibility of her statements; (2) her limitations of concentration, persistence, and pace; and (3) the combined effects of all of her impairments, severe and non-severe. Finding no reversible error, I affirm the ALJ's decision and dismiss this action.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Medical Conditions and Vocational History

  Plaintiff filed the instant applications for benefits on December 2, 2016, alleging a disability onset date of February 5, 2005. (Tr. at 275, 282.)[2] She identified a number of

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this action.

[2] Specifically, plaintiff applied for disabled widow's benefits and supplemental security income, alleging the same onset date. (Tr. at 32.) The widow's benefits aspect is not at issue in this action, so I do not discuss it further. The record shows that plaintiff filed a previous application in 2012, which was denied finally in November 2016. (Tr. at 121-22; see also Tr. at 89.)

impairments limiting her ability to work, including fibromyalgia, neuropathy, diabetes, anxiety, depression, high blood pressure, hypothyroidism, hallux rigidus (stiff toes) in both feet, obesity, fatigue, transposition of the ulnar nerve, tarsal tunnel, and plantar fasciitis. (Tr. at 316.)  Plaintiff reported employment as a full-time laundry worker from 1990 to 2005 and a part-time merchandizer at a retail store (Goodwill Industries) from November 2015 to the present.  (Tr. at 317, 331.)  Earnings records collected by the agency indicate that plaintiff made $1140.51 in 2015, $5770.42 in 2016, $12,869.28 in 2017, and $12,045.62 in 2018.  (Tr. at 307, 311.)

The agency also collected plaintiff's medical records dating back to 2015, which show that on April 9, 2015, she saw Michael Duffy, M.D., her primary physician, for follow-up of her multiple medical problems.  Dr. Duffy noted: "She's doing about the same in general.  She has her usual fatigue and generalized pain."  (Tr. at 641.)  Based on lab results, Dr. Duffy adjusted plaintiff's hypothyroid medication and continued medication for her well-controlled hypertension.  (Tr. at 537, 641.)  On exam, she displayed multiple trigger points.  (Tr. at 643.)  The note lists a variety of diagnoses including hypothyroidism, history of cerebral palsy, hypertension, obesity, fibromyalgia, and depression with anxiety. (Tr. at 643.)

On May 28, 2015, plaintiff saw Camille Zizzo, DPM (podiatrist), regarding bilateral foot issues, including numbness, cramps, tingling, and pain.  (Tr. at 652.)  On exam, she had normal range of motion, muscle strength, and gait.  Pain was present on palpation of the feet.    (Tr. at 653.)    Degenerative changes were noted in the first MPJ (metatarsophalangeal joint) bilaterally but otherwise no significant abnormality.  Dr. Zizzo

recommended correctly sized shoes, arch supports, taping, and meloxicam (a non-steroidal anti-inflammatory drug).  (Tr. at 654.)

Plaintiff returned to Dr. Zizzo on June 11, 2015, for recheck of her feet, stating that she was improving.  (Tr. at 660.)  On exam, she displayed normal range of motion, muscle strength, and gait.   Dr. Zizzo recommended she continue with inserts and use of meloxicam.  (Tr. at 661.)

On July 2, 2015, plaintiff told Dr. Zizzo she had discontinued the meloxicam after the first course.  She stated that she was getting a lot of cramping and pain across the tops of her feet. She had been wearing new shoes and inserts.  Periods of standing caused increased pain in both feet.  (Tr. at 666.)  On exam, she displayed normal range of motion, muscle strength and gait, but pain on palpation of the feet, right greater than left.  Dr. Zizzo recommended a course of prednisone.  (Tr. at 667.)

On July 16, 2015, plaintiff reported no relief from the anti-inflammatory medications.  (Tr. at 603.)  On exam, her range of motion and strength were normal, but her gait was abnormal ("she doesn't push off much during the gait cycle").  Dr. Zizzo referred her to neurology for EMG/NCV studies.  (Tr. at 604.)

On August 19, 2015, plaintiff returned to Dr. Zizzo for discussion of her nerve conduction studies, which revealed neuropathy.  Plaintiff had been unresponsive to anti-inflammatory medications, and she could not tolerate gabapentin.  Dr. Zizzo started her on Lyrica (a medication used to treat nerve pain and fibromyalgia).[3]  (Tr. at 609.)

---

[3] https://www.webmd.com/drugs/2/drug-93965/lyrica-oral/details  (last  visited  Aug.  5, 2021).

On September 23, 2015, plaintiff saw Dr. Duffy for evaluation of work capacity per the Department of Workforce Development. She was applying for disability and possible retraining. She indicated that she had not been able to work for the past few years. She had previously been diagnosed as having cerebral palsy. She stated that she "cannot learn easily . . . had a difficult time in school and is a slow reader." (Tr. at 616.) She also had chronic pain with her fibromyalgia. Her feet bothered her with prolonged standing, and she had been diagnosed as having a mild peripheral neuropathy. Dr. Zizzo had put her on Lyrica, but plaintiff stated it did not really help and just made her drowsy. She had a previous history of carpal tunnel and left ulnar nerve surgery in the left arm, and she had a difficult time raising her arm above the shoulder or lifting. She also stated her grip strength was not as good on the left as the right. (Tr. at 616.) On exam, she appeared as "an overweight somewhat slow middle-aged female in no acute distress." (Tr. at 619.) She had multiple trigger points and slightly decreased left hand grip. She was unable to raise her left arm without discomfort. Neurological exam was normal, and her speech and behavior were appropriate. (Tr. at 619.)

On November 3, 2015, plaintiff saw Dr. Duffy for a general physical, "not doing badly." (Tr. at 636.) She had applied for disability, unsuccessfully. She was working with vocational rehabilitation and Goodwill. She had been in good spirits. Gait had been stable, but endurance was poor. (Tr. at 636.) On exam, she presented as a "pleasant somewhat simple middle-aged female," in "no apparent distress." (Tr. at 639.) She displayed full range of motion of all four extremities, with no joint swelling or tenderness. (Tr. at 639.)

On December 9, 2015, plaintiff saw Thurmond Lanier, DPM (podiatrist), regarding pain, burning, and tingling in her feet. The inserts, taping, and medication did not help. She reported significant pain in her great toe joints, right worse than left. (Tr. at 678.) On exam, she displayed 5/5 muscle strength but severe pain in the MPJ through a range of motion and with palpation. Dr. Lanier diagnosed tarsal tunnel syndrome bilaterally right greater than left and hallux rigidus bilaterally. He suggested another EMG/NCV. (Tr. at 679.) On review of the previous x-rays, he noted severe arthritis in the great toe joints. He provided an injection in the right foot. (Tr. at 680.)

On January 15, 2016, plaintiff followed up with Dr. Lanier regarding her bilateral foot pain. The studies had revealed mild tarsal tunnel syndrome of the right lower extremity. She continued to report pain in her great toe joint, mostly in the left foot; the cortisone injection in her right first MPJ provided very good relief. (Tr. at 542.) Dr. Lanier suggested a cortisone injection on the left as it had provided good relief on the right. Plaintiff agreed, and Dr. Lanier provided the injection. (Tr. at 543.)

On February 2, 2016, plaintiff saw Dr. Duffy for a three month follow up. She was working about 20 hours a week at Goodwill and was very happy. "She's doing well mentally. Physically she doesn't feel bad." (Tr. at 556.) She did have a problem with her feet for which she was seeing Dr. Lanier. Recent testing had revealed an A1c in the diabetic range. (Tr. at 556.) Her "problem list" included hypothyroidism, hyperlipidemia, ulnar nerve entrapment at the elbow, asthma, obesity, fibromyalgia, depression with anxiety, impaired fasting glucose, idiopathic peripheral neuropathy, and essential hypertension. (Tr. at 558.) Dr. Duffy started her on metformin for diabetes and continued her on her current treatment for hypothyroidism and hypertension, as she was doing well

5

regarding these conditions. (Tr. at 553-54.) Regarding depression and anxiety, Dr. Duffy noted: "She thinks she's doing very well right now. Has a part-time job and is comfortable about her lifestyle." (Tr. 554.)

On March 11, 2016, plaintiff followed up with Dr. Lanier, wanting to discuss surgical intervention. On review of systems, she denied back or joint pain, focal weakness or sensory changes, and depression or anxiety. (Tr. at 569.) On exam, she displayed no edema, tenderness, or deformities. Neurologically, she was alert and oriented with normal motor function, normal sensory function, and no focal deficits. Her speech and behavior were appropriate. She did have pain with end range of motion bilaterally of the first MPJ. After discussing options, plaintiff agreed to decompression osteotomy, first metatarsal right foot. (Tr at 570.)

On April 8, 2016, plaintiff saw Mary Miller, APNP, for a preoperative consultation. Miller noted that plaintiff had a history of cerebral palsy. She had no noticeable motor deficits but suffered from easy fatigue. She worked part-time at Goodwill Industries and ambulated without assistance. She had a history of diabetes. She also had hypertension and hyperlipidemia, both well controlled. (Tr. at 581.) The record also noted carpal tunnel release (left) and ulnar nerve transposition (left) in 2012. (Tr. at 583.) She had completed high school and was trying to get on disability. (Tr. at 584.) On exam, she displayed equal range of motion, steady gait, and 5/5 strength in all four extremities. She was alert and oriented with good insight and intact memory. (Tr. at 585.) Miller saw no contraindication for surgery. (Tr. at 586.) On April 20, 2016, plaintiff had right foot surgery. (Tr. at 566.)

6

On April 29, 2016, plaintiff followed up with Dr. Lanier, nine days post-surgery on her right foot. She stated the pain was getting better. Dr. Lanier removed the sutures and directed her to start range of motion exercises. (Tr. at 437.)

On May 2, 2016, plaintiff saw Dr. Duffy for an annual physical. She thought she was doing very well. She recently had right foot surgery with Dr. Lanier and was very happy with her care from him. She had recently been diagnosed with diabetes. She had been working part-time at Goodwill and felt better mentally since she started working. "She is applying for disability still." (Tr. at 448.) On exam, she had full range of motion of all four extremities, normal gait and sensory function, and no motor deficits in all four extremities. Mental status was normal with no gross cognitive impairment. She was cooperative, with appropriate mood and affect, and normal judgment. (Tr. at 453.) She stated that now she was working part-time she felt less depressed and anxious. (Tr. at 446, 454.) Dr. Duffy noted she was doing well regarding her hypertension, hypothyroidism, and hyperlipidemia on current treatment. (Tr. at 446-47, 454.) Regarding diabetes and obesity, Dr. Duffy wanted her to see a diabetic educator regarding diet and lifestyle. (Tr. at 447, 454.) Later that month, plaintiff saw Molly Spaulding, RD (registered dietician), to learn dietary strategies for managing her recently diagnosed type 2 diabetes. (Tr. at 516, 518.)

On May 12, 2016, plaintiff returned to Dr. Lanier, three weeks post-surgery, stating that things were going much better. She was able to put pressure on her foot and the swelling had come down, although she still had some trouble with active range of motion. She had been walking without her boot. Dr. Lanier referred her to physical therapy to increase range of motion and work on her gait. (Tr. at 511.)

On June 11, 2016, plaintiff saw Dr. Lanier seven weeks following the surgery on her right foot, stating everything was going very well. She was very pleased with her pain relief and was interested in having the same procedure performed on her left foot. (Tr. at 469.) X-rays of the right foot showed intact hardware, osteotomy healed. She was to continue working with physical therapy, slowly increase her activity level, and return to work. She consented to the same procedure (decompression osteotomy first metatarsal) on the left foot. (Tr. at 470.)

On June 21, 2016, plaintiff saw Dr. Duffy for a pre-operative consult, and he noted she did well with her right foot surgery in April and anticipated no problems with surgery on her left foot. (Tr. at 479-80.) She had some mild residual stiffness and numbness but very little pain. She otherwise felt her health was stable. (Tr. at 481.) On exam, Dr. Duffy noted equal range of motion and steady gait. (Tr. at 485.) He cleared her for surgery, which was performed later that month. (Tr. at 486.)

On July 6, 2016, plaintiff saw Shari Lux, RN, regarding diabetes self-management education. (Tr. at 491.) She arrived in a wheelchair, having had foot surgery a week ago and had limited weight bearing instructions. (Tr. at 494.)

On July 8, 2016, plaintiff saw Dr. Lanier one week following her left foot surgery, stating things were going well. He removed the sutures and stated she could weight bear as tolerated in a boot. (Tr. at 500.)

On July 22, 2016, plaintiff saw Dr. Lanier three weeks post-surgery, stating things were going okay, although she did have some pain. She was to start physical therapy at that time. (Tr. at 388.)

8

On July 18, 2016, plaintiff again met with dietician Spaulding to discuss her dietary and activity goals. (Tr. at 505.) Plaintiff reported worry about her diabetes and was fearful about returning to work at Goodwill, requesting a referral to behavioral health. (Tr. at 507.)

On August 22, 2016, plaintiff again saw Nurse Lux regarding diabetes self-management education. (Tr at 392-94.) She was at that time still off from work at Goodwill following her foot surgery, planning to return on September 5. She was worried about whether she would be able to stand on her feet without taking a break, plus she had a new boss and was worried about the change. Plaintiff reported stress was an issue with all the changes occurring at work. (Tr. at 396.) Lux encouraged plaintiff to attend a free monthly support group. (Tr. at 397.)

On September 2, 2016, plaintiff followed up with Dr. Lanier, doing okay but still having significant pain in her left foot. She had been participating in physical therapy. She was to return in one month to discuss work restrictions. (Tr. at 402.) On September 23, plaintiff stated things were going well; she had finished therapy and inquired about going back to work. Dr. Lanier indicated she could return to work on October 3, working a full shift but with a restriction on squatting. She was to follow up as needed. (Tr. at 407.)

On October 17, 2016, plaintiff saw dietician Spaulding regarding her goals of healthy eating, increasing physical activity, and restricting sodium intake. (Tr. at 412.) Plaintiff had reported feeling anxious and depressed at their last visit, requesting a referral to behavioral health, but she stated that this had all changed since she got back to work; she reported her stress level had been much improved since returning to work. She

9

continued on light duty but had regained most of her functionality in her left leg/foot. (Tr. at 414.)

On November 4, 2016, plaintiff saw Dr. Duffy, who noted a diagnosis of type 2 diabetes mellitus without complication and without long-term use of insulin. (Tr. at 385.) He also listed several other diagnoses, including hypothyroidism, mixed hyperlipidemia, depression with anxiety, benign essential hypertension, fibromyalgia, and idiopathic peripheral neuropathy. (Tr. at 386.) He continued her on metformin for diabetes and levothyroxine for her thyroid condition (Tr. at 428), noting she was doing well regarding both conditions (Tr. at 429-30). Regarding depression and anxiety, she thought she was doing better. She was back to work and seemed to be handling stress better, although her coping skills were marginal. (Tr. 430.) She reported persistent foot pain after her surgery, but Dr. Duffy told her to be patient, noting her pain tolerance may be low because of fibromyalgia. (Tr. at 431.) Regarding idiopathic peripheral neuropathy, Dr. Duffy noted physical exam was normal, although plaintiff did complain of some numbness and paresthesia in the foot. She did have neuropathy seen on her EMG, probably secondary to her diabetes. (Tr. at 431.) She was to return in six months for a physical. (Tr. at 432.)

On January 18, 2017, plaintiff saw Dr. Duffy following a January 15 emergency room visit for chest pain. She was anxious and stressed, and also had an upper respiratory infection. Dr. Duffy did not believe this was angina. He diagnosed depression with anxiety and atypical chest pain. (Tr. at 686-87.)

On May 19, 2017, plaintiff saw Dr. Duffy for an annual physical. She was then working full time at Goodwill, had benefits, and was very happy. She had been more active physically and was losing weight. Her mental status had also been better. (Tr. at

10

699.)  On exam, she displayed full range of motion in all four extremities, no joint swelling or tenderness, normal gait and sensory function, and no motor deficits in all four extremities.  Mental status was normal with no gross cognitive impairment.  She was cooperative, with appropriate mood and affect, and normal judgment.  (Tr. at 704.)  Dr. Duffy assessed hypothyroidism, doing well on current treatment; mixed hyperlipidemia, doing well on current treatment; depression with anxiety, doing much better since she got a full-time job; type 2 diabetes with polyneuropathy, doing very well; and benign essential hypertension, to stay on her medication.  Dr. Duffy concluded that she was doing very well and would see her back in six months.[4]  (Tr. at 705.)

On July 13, 2018, plaintiff saw nurse practitioner Miller to follow up and transfer care from Dr. Duffy.  (Tr. at 718.)  She was being worked up by rheumatology regarding her myalgias.  She found that exercise and Cymbalta helped.[5]  After long days at work, she felt very fatigued.  (Tr. at 719.)  On exam, she displayed equal range of motion, steady gait with mild gait disturbance, and 5/5 strength in all four extremities.  Mentally, she was alert and oriented, with good insight and intact memory.  (Tr. at 721.)  Miller assessed hypothyroidism, mixed hyperlipidemia, type 2 diabetes mellitus with polyneuropathy, and benign essential hypertension, continuing medications.  (Tr. at 722.)

---

[4] In her brief, the Acting Commissioner states that in February 2018, after her cervical spine surgery, plaintiff reported difficulty opening containers and dropping items.  (Def.'s Br. at 4, citing Tr. at 667.)  I see no reference to cervical spine surgery in the record, and the transcript page cited pertains to a July 2015 visit with Dr. Zizzo, the podiatrist.  The Commissioner also refers to emergency care for atrial fibrillation, citing record pages that exceed the length of the transcript filed with the court (Def.'s Br. at 4, citing Tr. at 829, 831), and to April 2018 MRIs (Def.'s Br. at 4, citing Tr. at 586, 598-99, 634, 716, 727, 731), but I am unable to find reference to any such scans on the pages cited.

[5] Cymbalta (duloxetine) is an anti-depressant medication, which is also used to treat fibromyalgia.  https://www.drugs.com/cymbalta.html (last visited Aug. 5, 2021).

11

On November 16, 2018, plaintiff returned to Miller, noting that she had changed her job duties, and it was much less stressful for her mentally and physically. She continued with some chronic ambulation issues and foot pain. She reported having RA (rheumatoid arthritis) and expressed concern about the cost of medication. She was taking duloxetine. She continued to have foot problems and mild neuropathy. Her diabetes was under good control, and her blood pressure was excellent. (Tr. at 723.) On exam, she displayed equal range of motion, steady gait with a slight limp, and 5/5 strength in all four extremities. Mentally, she was alert and oriented, with good insight and intact memory. (Tr. at 725.) Miller continued medications. (Tr. at 727.)

On January 8, 2019, plaintiff saw Dr. Zhijie Zhou, a rheumatologist, regarding her history of joint pain, which she indicated she had developed about seven years ago, without precedent events. She reported joint pain in her hands, left elbow, left wrist, and left foot, with her main complaint being left foot pain. She also reported neuropathy in her left leg and a history of diabetes. She had tried gabapentin and Lyrica in the past, but stated the gabapentin was not helpful and she did not tolerate the Lyrica. She was currently on Cymbalta, stating it was somewhat beneficial. (Tr. at 728.) She reported widespread pain, which had been intermittent, difficulty using her hands to grasp small objects, and using a cane. She also reported severe fatigue. An x-ray of the foot revealed stable surgical changes and bilateral osteoarthritis of the first MTP joints. (Tr. at 729.) An MRI of the right ankle revealed mild/chronic plantar fasciitis. (Tr. at 730.) On exam, plaintiff appeared in no acute distress, with no proximal muscle weakness and good range of motion but multiple tender points. (Tr. at 733.) Dr. Zhou assessed chronic widespread pain, fatigue, sleep disturbance, memory impairment, and 18/18 tender points, consistent

with fibromyalgia. Dr. Zhou did not believe plaintiff had rheumatoid arthritis. (Tr. at 734.) Dr. Zhou recommended an increase in Cymbalta, adding amitriptyline for sleep disturbance, and continuing Tylenol as needed. (Tr. at 735.) Dr. Zhou further stated: "I would agree with disability. Fibromyalgia cannot be cured, and the patient is unable to function normal." (Tr. at 735.)

On April 9, 2019, plaintiff followed up with Dr. Zhou, continuing on Cymbalta and amitriptyline without significant side effects. Her symptoms had been the same, with chronic widespread pain, both articular and muscular. (Tr. at 741.) On exam, she was alert and oriented, in no acute distress, with no edema or muscle weakness and normal range of motion but with diffuse muscle tenderness and 18/18 tender points. (Tr. at 741-42.) Dr. Zhou again assessed fibromyalgia, increasing duloxetine and amitriptyline. Dr. Zhou stated: "Significant functioning impairment. Again, would agree with disability." (Tr. at 744.)

On June 3, 2019, plaintiff saw nurse practitioner Miller for an annual exam. She reported pain relief with Dr. Zhou in rheumatology and joining the YMCA for exercise. She was trying to get disability for her RA. (Tr. at 65.) On exam, she was in no apparent distress (Tr. at 69), with full range of motion in all four extremities (Tr. at 70). Her gait was normal, with normal sensory function and no motor deficits. Mentally, she was cooperative, with appropriate mood and affect, and normal judgment. (Tr. at 70.) Miller assessed type 2 diabetes mellitus with diabetic polyneuropathy, without long-term use of insulin, continuing metformin; benign essential hypertension, at good goal (Tr. at 71); and hypothyroidism, continuing Levothyroxine (Tr. at 72).

**B.     Procedural History**

**1.     Plaintiff's Application and Agency Decisions**

As indicated, plaintiff applied for benefits in December 2016.  (Tr. at 275, 282.)  In her function report, plaintiff complained of pain from diabetic/peripheral neuropathy, as well as fibromyalgia, bilateral foot pain, lower back pain, left arm pain, left hand pain, left hand carpal tunnel problems, hyperlipidemia, hypothyroidism, asthma, and ulnar nerve entrapment at the left elbow.  She also reported depression, anxiety, and mood swings. She complained of severe pain in the legs with standing and walking, and severe back pain with sitting, requiring her to alternate positions.  She further reported numbness, tingling, and pain in both feet.  Finally, she reported difficulty with focus and concentration, getting easily distracted because of pain.  (Tr. at 323.)

The agency denied the application initially on February 8, 2017 (Tr. at 144, 172), based on the reviews of George Walcott, M.D., and Beth Jennings, Ph.D, who concluded that plaintiff had no severe physical or mental impairments (Tr. at 127, 129).  Dr. Walcott noted the references in the records to fibromyalgia, neuropathy, diabetes, high blood pressure, hypothyroidism, foot pain, obesity, fatigue, and left arm surgery, but found that these impairments caused no more than minimal limitations.  (Tr. at 126-27.)  Her physical examinations showed a steady/normal gait, intact sensation, and 5/5 motor strength in all four extremities.  All other impairments were controlled with medications.  (Tr. at 127.) Dr. Jennings found that plaintiff's anxiety/depression caused no more than mild limitations in  understanding,  remembering,  or  applying  information;  interacting  with  others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. at 128.)  Dr. Jennings further noted that plaintiff never went to see behavioral health, with

all assessments being done by her primary doctor, who prescribed medication. Dr. Jennings concluded: "Depression/Anxiety well controlled on medication." (Tr. at 129.)

Plaintiff requested reconsideration, and the agency sent her for an evaluation with Steve Krawiec, Ph.D., on August 8, 2017. Dr. Krawiec noted that plaintiff's speech was well-organized, understandable, and goal directed, and her affect was appropriate. When asked why she was applying for disability, plaintiff referenced a previous arm injury, which never healed despite surgery. She indicated that she also had fibromyalgia, carpal tunnel syndrome, and rheumatoid arthritis, as well as a mild case of cerebral palsy when she was younger. She mentioned a recent surgery for plantar fasciitis, which kept her off work from April to October 2016. She said that she also had fatigue, depression, and anxiety. (Tr. at 706.)

Asked what the depression involved, plaintiff said a lot of crying episodes, which had been the case since the death of her husband in 2010. She sometimes got angry and took it out on people. (Tr. at 706.) Asked about anxiety, she said that when she "gets all worked up" her blood pressure increased and her chest tightened. Asked about the frequency of anxiety, she said once or twice a year, last in March or April 2017. When asked about treatment, she indicated she did not receive counseling but sometimes talked to her Chaplin. She had also been prescribed medications. She reported 50% benefit from treatment. (Tr. at 707.)

Asked about daily activities, plaintiff said she worked at Goodwill, 32 hours per week, and had that job for two years. It began part-time but became full-time. Outside of work, she hung out with friends, went shopping, and took road trips with her sister. She

got along with others "very well." (Tr. at 707.) She was a high school graduate. (Tr. at 707.)

On mental status exam, plaintiff was oriented. On a short-term memory task, she recalled three of three items on immediate trial and after four minutes had elapsed. Her attention and concentration abilities were adequate for following and participating in ongoing conversation. She also did a good job on a serial 2's task. Her remote memory and fund of information seemed grossly intact. (Tr. at 707.) She also did a good job on arithmetic computations and an adequate job on a similarities task. (Tr. at 708.)

Dr. Krawiec diagnosed unspecified depressive disorder but was not inclined to diagnose an anxiety disorder. While plaintiff reported episodes of anxiety, they only happened once or twice per year. Dr. Krawiec concluded:

> I believe that this individual has adequate cognitive capacity to understand and remember and apply information for things such as job instructions and dealing with work responsibilities. I do not think she necessarily would have trouble when it would come to interacting with others. She said that sometimes she would get angry and take it out on others and she said that she could get very verbal as she put it and she said sometimes she has hit other people. However, both the claimant and her sister said that she got along very well with others. I do not think that she has [a] mental health or cognitive impairment of a sort that would interfere with her being able to concentrate and persist and maintain pace. She did not display any notable difficulty with attention, concentration, or memory. I do not think that she necessarily would have difficulty regulating emotions and controlling behaviors associated with emotions in a work setting.

(Tr. at 709.)

On August 14, 2017 (Tr. at 168, 192), the agency denied reconsideration based on the reviews of Pat Chan, M.D., and Therese Harris, Ph.D., who agreed that plaintiff had no severe impairments (Tr. at 151-53). Plaintiff then requested a hearing before an ALJ. (Tr. at 217.)

16

### 2. Hearing

On April 3, 2019, plaintiff appeared with counsel for her hearing before the ALJ. She also presented testimony from her sister. The ALJ summoned a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do. (Tr. at 84, 86-87.)

At the outset of the hearing, plaintiff's counsel moved to amend the onset date to July 13, 2018, corresponding to plaintiff's visit with nurse practitioner Miller on that date. (Tr. at 88, citing Tr. at 719.) The ALJ expressed concern about the implications with respect to the application for widow's benefits and agreed to keep the record open for two weeks for a post-hearing submission on the issue. (Tr. at 89-92.) The ALJ also expressed concern that counsel was amending to a date last insured eight months before the hearing, implicating the requirement that plaintiff establish a disabling impairment expected to last for at least 12 months.[6] (Tr. at 93-94.)

Plaintiff testified that she worked at Goodwill, 20 hours per week, four hours per day. She had been at Goodwill for 3-½ years. She had been working full-time, but in February 2018 the store leader reduced her to part-time. (Tr. at 96.) Her duties apparently remained the same, working in apparel and merchandising. (Tr. at 97.) The ALJ asked counsel to provide any medical evidence suggesting a need to go down to part-time. Counsel responded that Goodwill is not a competitive work environment; it is a non-profit that employs people with disabilities. (Tr. at 97.) The ALJ responded that while it was his general impression that Goodwill employed people with challenges, he

---

[6] See 42 U.S.C. 423(d)(1) ("The term 'disability' means—(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]").

did not have personal knowledge that this was a sheltered environment, again inviting counsel to submit documentation. (Tr. at 98.)

Plaintiff testified that she reduced her hours in February 2018 due to pain in her legs, feet, and elbow, and inability to lift heavy things; they also said she was walking kind of slow and was not getting things done fast enough. (Tr. at 98.) She further complained of trouble with repetitive reaching past her head with her left arm. (Tr. at 99.)

Plaintiff testified that she could not lift anything heavier than a gallon of milk; she could sit for five to ten minutes before she had to stand up, stand for about half an hour before experiencing discomfort, and walk half a block before needing a rest. (Tr. at 99-100.) She indicated that she could bathe herself but needed help washing her back because she could not reach it. She could shop and cook but fatigued after about 15 minutes. (Tr at 100.)

Plaintiff further testified that she experienced depression, which caused her to cry and lay in bed until she fell asleep. She also experienced anxiety, which caused angry outbursts where she would hit, yell, and swear. Sometimes her hands tingled, and she had trouble gripping things. (Tr. at 101.)

Plaintiff's counsel asked about accommodations at Goodwill, such as allowing her to work more slowly or doing easier work. Plaintiff responded: "It's kind of easy but yet it's not." (Tr. at 101.) "I try to do the best I can. They said I'm doing okay, so." (Tr. at 102.) Asked if she could work more hours, plaintiff said no because she got tired very easily after four hours. "I'm always fatigued and my neuropathy acts up and my elbow hurts, stuff like that." (Tr. at 102.)

Plaintiff testified that the pain in her feet was constant. She also stated she could not reach above her head "that well" with her left arm. (Tr. at 102.) Asked about her right arm, plaintiff indicated she had not had it checked yet, but it was possible she had carpal tunnel. (Tr. at 102-03.)

Plaintiff testified that she had surgery on two of her toes in 2016. She still had trouble with her feet; she could not bend her toes and her feet got numb. (Tr. at 103.)

Asked about concentration and focus, plaintiff testified that she could only concentrate on one thing at a time. If she was told to do multiple things at one time, she could not do it. (Tr. at 103.)

Plaintiff's sister testified that they lived together. (Tr. at 103-04.) She indicted that plaintiff was not able to do any chores requiring her to get down on her hands and knees due to pain; she also could not stand any length of time due to pain and fatigue. (Tr. at 104.) Asked about personal care, plaintiff's sister said she helped plaintiff wash her back. (Tr. at 105.) Plaintiff had trouble doing anything repetitively because it caused too much pain. (Tr. at 105.) Regarding plaintiff's reduced hours at Goodwill, plaintiff's sister testified that plaintiff was starting to slow down due to pain in her feet, which her boss noticed. (Tr. at 105.)

On questioning by the ALJ, plaintiff testified that her health worsened in July 2018. She first saw Dr. Zhou in January 2019. (Tr. at 106.) The ALJ noted that when a claimant was attempting to establish an ongoing 12-month period and a medical source's familiarity with an individual over time, he would need to consider the fact that any opinion was based on a single interaction with the claimant. (Tr. at 107.)

19

Plaintiff further testified that she lived in an apartment with her sister. She did not drive, never having obtained her license, and got around with her sister or on the bus. (Tr. at 107.) Asked if any doctor had given her specific limitations, plaintiff said he "really doesn't want me doing anything repetitious." (Tr. at 108.)

Asked to describe her current job at Goodwill, plaintiff said she was doing maintenance work, e.g., sweeping, mopping, and cleaning. She did the apparel and merchandising when she had time after maintenance. (Tr. at 108.) The employer had a list on the maintenance closet that she followed. She started doing maintenance in November 2018. (Tr. at 109.) From February to November 2018, she did merchandising, which involved taking items that had been sorted and priced and putting them on the floor for sale. (Tr. at 110.) She testified that "apparel" meant hanging clothes on a rack. (Tr. at 114.) The ALJ again invited counsel to submit records indicating when plaintiff was working full-time. (Tr. at 111.)

The VE classified plaintiff's work at Goodwill as garment sorter, light and unskilled, and store laborer, light as performed, medium generally, also unskilled. (Tr. at 113.) The ALJ indicated that this appeared to be a composite job. (Tr. at 114-15.) Plaintiff also previously worked as a laundry worker, which the VE classified as heavy as performed, medium generally, and unskilled. (Tr. at 115.)

The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience; capable of light work; able to ambulate effectively but doing most walking on even terrain; never climbing ladders, ropes and scaffolds; no more than occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; no more than occasionally reaching overhead with the (non-dominant) left upper

extremity; using the hands frequently but not constantly for fine and gross manipulation, but with no forceful grasping or torqueing (such as twisting stuck valves); no working in hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights, or where they would have concentrated exposure to unguarded hazardous machinery; limited to simple, routine tasks, jobs having no more than occasional and minor changes in the work setting and jobs that do not require considerable multi-tasking or self-direction; and able to work at an average production pace, but not at a significantly above average or highly variable pace. (Tr. at 115-17.) The VE testified that such a person could do the garment sorter and store laborer jobs, as plaintiff performed them. (Tr. at 117.) The VE testified that the person could also do other jobs, such as office helper and mail clerk. (Tr. at 117.)

The VE testified that employer "off task" allowance would be up to 15% of the workday, absenteeism typically one time per month, and typical breaks would be 10-15 minutes in the morning and afternoon and 30 minutes to an hour for lunch. (Tr. at 117-18.) If the person needed a sit/stand option at will, the office helper and mail clerk jobs would be ruled out. (Tr. at 118.) The VE indicated that her testimony did not conflict with the Dictionary of Occupational Titles ("DOT"). The DOT does not address off task, absenteeism, or breaks; the VE relied on her professional experience on those issues. (Tr. at 118.)

In a post-hearing submission, plaintiff's counsel indicated that plaintiff was fired from Goodwill on April 4, 2019. Counsel further indicated that Goodwill is a non-profit, attaching a copy of the mission statement from its website. (Tr. at 375.) Counsel further stated that plaintiff received special accommodations, including additional break time,

flexible work hours, longer break periods, a sit/stand option, and coworkers helping out. He thus argued that this was not a competitive work environment. (Tr. at 375.) Counsel did not address the onset date issue.

### 3. ALJ's Decision

On July 29, 2019, the ALJ issued an unfavorable decision. (Tr. at 29.) In rendering his decision, the ALJ followed the five-step evaluation process set forth in the regulations. (Tr. at 33, citing 20 C.F.R. § 404.1520(a) & 20 C.F.R. § 416.920(a).)

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since February 5, 2005, the alleged onset date.[7] (Tr. at 34.) The ALJ noted that plaintiff worked after the alleged onset date, but her earnings did not exceed the substantial gainful activity threshold in any one year (although she came close in 2017 and 2018). (Tr. at 35.)

At step two, the ALJ determined that plaintiff had the following severe impairments: disorders of the muscles and fascia, obesity, depression, and anxiety. (Tr. at 35.) Plaintiff had been diagnosed with diabetes, but the ALJ found this impairment non-severe. An electromyogram showed neuropathy, but it was mild. The record also showed that during the period at issue plaintiff kept her diabetes under good control, with no complications or hospitalizations. (Tr. at 35.) The ALJ further noted that plaintiff told providers she had rheumatoid arthritis. However, the source of this diagnosis was unclear. When plaintiff saw a rheumatologist in 2019, the doctor determined that plaintiff did not have rheumatoid

---

[7] The ALJ noted that at the hearing plaintiff's counsel moved to amend the onset date to July 13, 2018. The ALJ did not accept the amendment at that time, and counsel did not raise the issue in the post-hearing brief. The ALJ accordingly considered plaintiff's condition since February 5, 2005, the original alleged date. (Tr. at 35.)

Case 1:20-cv-00777-LA   Filed 08/09/21   Page 22 of 51   Document 30

arthritis.  The ALJ accordingly determined that rheumatoid arthritis was not a medically determinable impairment.  (Tr. at 35.)  The ALJ noted that in assessing plaintiff's residual functional capacity ("RFC") he considered all medically determinable impairments, including those that were not severe.  (Tr. at 35.)

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing.  The ALJ noted that no medical source opinion indicated that plaintiff met or equaled a Listing, nor did plaintiff's representative argue that any Listings were met or equaled.  (Tr. at 35.)

The ALJ specifically determined that plaintiff's foot impairments did not meet or equal any of the section 1.00 musculoskeletal Listings.  To meet or equal these Listings, the claimant must be unable to ambulate effectively.  However, in multiple examinations plaintiff walked with a normal gait, even after she had surgery on toes in both feet.  In recent examinations, she started to display a "slight" limp, but she was able to ambulate without an assistive device.  "This does not show [plaintiff] is unable to ambulate effectively."  (Tr. at 36.)

The ALJ also considered whether plaintiff met or equaled any Listings under SSR 12-12p, which addresses the evaluation of fibromyalgia.  A recent examination identified 18 out of 18 fibromyalgia tender points.  (Tr. at 36, citing Tr. at 733, 738.)  The ALJ accordingly evaluated whether plaintiff's conditions equaled any other listed impairment set forth in the SSR.[8] The ALJ noted that plaintiff was able to ambulate effectively, as

_____

[8] While fibromyalgia is not a listed impairment, SSR 12-2p directs the ALJ to determine whether fibromyalgia medically equals a Listing (e.g., Listing 14.09D pertaining to inflammatory arthritis), alone or in combination with at least one other medically determinable impairment.  2012 SSR LEXIS 1, at *16-17.

previously noted. She also did not have any chronic reductions in use of the hands or upper extremities; she had "slightly decreased" grip strength at an examination on September 23, 2015, but there was no other evidence regarding upper extremity deficiencies. (Tr. at 36.) "She is not otherwise as limited as set forth under any listings." (Tr. at 36.)

The ALJ next evaluated plaintiff's obesity under SSR 19-2p,[9] noting that on July 18, 2016, plaintiff was noted to stand 5'4" tall and weigh 193, for a BMI (body mass index) of 33.1. The ALJ concluded that the evidence did not show plaintiff's obesity caused limitations consistent with other listed impairments. Specifically, it did not result in inability to ambulate effectively under section 1.00, affect plaintiff's pulmonary capacity under section 3.00, or cause reduced function in her cardiovascular system under section 4.00. In fact, she told her doctor that she walked for exercise and was able to lose weight. (Tr. at 36.)

Finally, the ALJ evaluated plaintiff's mental impairments under Listing 12.04. In order to satisfy that section, the impairment must result in one "extreme" or two "marked" limitations under the "paragraph B" criteria: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. at 36.)

In the area of understanding, remembering, or applying information, the ALJ found a "moderate" limitation. While plaintiff told a provider she considered herself a slow

---

[9] SSR 19-2p explains that obesity is also not a listed impairment; however, the functional limitations caused by obesity, alone or in combination with other impairments, may medically equal a Listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments medically equals a Listing. 2019 SSR LEXIS 2, at *11.

learner (and that doctor described plaintiff as "simple"), there was no indication that plaintiff had an intellectual disability. She graduated from high school, and at the consultative exam she was able to perform arithmetic calculations and displayed adequate memory. The ALJ found that the evidence demonstrated a moderate but not a marked limitation in this functional area. "The residual functional capacity accounts for this with a limitation to simple, routine tasks." (Tr. at 36.)

In interacting with others, the ALJ found no limitation. Plaintiff told the consultative examiner that she has friends and liked to go on road trips. She testified that she likes to go shopping and said she gets along with others "very well." And she displayed no behavioral problems during her office visits with physicians. (Tr. at 37.)

Regarding concentrating, persisting, or maintaining pace, the ALJ found a moderate limitation. At the consultative exam, plaintiff displayed adequate attention and concentration, as she was able to perform the serial two task and was able to follow and participate in conversation. However, she periodically complained of problems with concentration and became tearful during an appointment. The ALJ determined that because these problems were relatively intermittent, and she displayed adequate attention and concentration during the consultative exam, there was no more than moderate limitation in this functional area. "The residual functional capacity considers this with a limitation to work that does not require multitasking, and work at an average production pace but not a significantly above average or highly variable pace." (Tr. at 37.)

As for adapting or managing oneself, the ALJ found a moderate limitation. Plaintiff stated that she sometimes gets angry or frustrated when stressed at work. However, she

reported changing the duties at her job, which was "much less stressful" for her. She also presented as adequately groomed at the consultative exam, and she said she got along with her coworkers. "This establishes a moderate limitation in this functional area. The residual functional capacity accounts for this with a limitation to work with no more than occasional and minor changes in the work setting, and work that does not require considerable self-direction." (Tr. at 37.)

The ALJ acknowledged that the limitations identified in the paragraph B criteria are not a residual functional capacity assessment. The mental RFC used at steps four and five requires a more detailed assessment, and the RFC set forth in the decision reflected the degree of limitation found in the paragraph B mental function analysis. (Tr. at 37.)

Prior to step four, the ALJ determined that plaintiff had the RFC:

> to lift and carry up to 20 pounds occasionally and 10 pounds frequently, and has no limitations in her ability to sit, stand or walk throughout an 8-hour workday. She is able to ambulate effectively, but should be required to perform no more than minimal ambulation on uneven terrain. [Plaintiff] can occasionally climb ramps and stairs, and she can occasionally stoop, kneel, balance, crouch and crawl, but she can never climb ladders, ropes or scaffolds. She can occasionally reach overhead using her left upper extremity. [Plaintiff] can perform fine and gross manipulation frequently but not constantly, and is incapable of forceful grasping or torqueing. [Plaintiff] is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and she should avoid concentrated exposure to unguarded hazardous machinery. [Plaintiff] is further limited to simple, routine tasks involving no more than occasional and minor changes in the work setting. She is not capable of multitasking, or work requiring considerable self-direction. She can work at an average work pace, but not at a significantly above average or highly variable pace.

(Tr. at 37-38.) In making this finding, the ALJ considered plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R.

26

§§ 404.1529 & 416.929 and SSR 16-3p. The ALJ also considered the opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (Tr. at 38.)

In considering the symptoms, the ALJ noted the required two-step process under which he first had to determine whether plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce plaintiff's pain or other symptoms. Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited plaintiff's work-related activities. For this purpose, if the statements were not substantiated by objective medical evidence, the ALJ had to consider other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 38.)

The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 38.) The ALJ noted that although plaintiff alleged that she was very seriously limited because of her health problems, the evidence did not substantiate her claims. (Tr. at 38.)

Plaintiff testified that she did not think she could work full-time anymore because she has pain in her legs, feet, and elbows. (Tr. at 38.) She further testified that she is unable to lift things over her head and cannot do repetitive reaching or walk quickly enough to perform her job. (Tr. at 38-39.) She testified that the pain in her feet was constant. Plaintiff further testified that she could only stand half an hour and then would

need to take a break.  She said she could sit five to ten minutes before needing to stand and walk half an hour before needing to rest.  (Tr. at 39.)

The ALJ found that the evidence was not entirely supportive of these allegations. Plaintiff began to complain about bilateral foot pain in 2015.  Evaluations showed that she had a normal gait and full motor strength, but pain on palpation of her bilateral big toes. She received a cortisone injection in her right big toe, which she said provided significant relief.  An MRI of the right ankle on January 5, 2016, showed mild plantar fasciitis.  In 2016, she eventually had decompression surgery on her big toes.  Later records indicated the surgeries on her toes were successful.  On September 23, 2016, plaintiff said she was doing well, had finished physical therapy, and wanted to go back to work.  In a follow-up on November 4, 2016, plaintiff told her primary care physician, Dr. Duffy, that she had some pain in her foot, but an examination showed healing incisions and no sensory deficit. On January 19, 2017, plaintiff told Dr. Duffy she had not been feeling well the whole week because of a respiratory infection but made no mention of any problems with her feet. She saw Dr. Duffy again on May 19, stating she was "very happy" with her job and was losing weight because she was more active.  There were no abnormalities with her feet, and she had a normal gait, normal sensation, and full motor strength.  (Tr. at 39.)

Plaintiff began to see Mary Miller in July 2018.  She reported joint pains and said exercise helps with the pain.  Examinations showed full motor strength and a steady gait with a "mild gait disturbance."  At another visit on November 16, plaintiff said she had some pain in her feet and thigh.  She again had full motor strength but a slight limp.  (Tr. at 39.)

On January 8, 2019, plaintiff saw Dr. Zhou, a rheumatologist. She described widespread pain, which was intermittent. X-rays of the feet showed stable surgical changes and osteoarthritis in the big toes. Examination showed tenderness in the fingers and toes, but no synovitis. She had multiple positive tender points, consistent with fibromyalgia. Dr. Zhou diagnosed fibromyalgia but stated he did not believe plaintiff had rheumatoid arthritis. At a follow-up on April 9, 2019, plaintiff had continued positive tender points but no loss of muscle strength. (Tr. at 39.)

The ALJ concluded that the evidence showed plaintiff had a history of fibromyalgia, toe surgery, and plantar fasciitis. However, the evidence also showed that plaintiff had few physical limitations related to these conditions. (Tr. at 39.) Throughout the period at issue, she had a generally normal gait, which supported an RFC for light work, with additional limitations including minimal ambulation on uneven terrain, occasional climbing of ramps and stairs, and occasional postural movements. (Tr. at 39-40.) In consideration of her testimony regarding problems with her arms and hands, the ALJ found that plaintiff could reach overhead no more than occasionally with the left upper extremity; perform fine and gross manipulation frequently, but not constantly; and was incapable of forceful grasping. (Tr. at 40.)

The ALJ acknowledged that plaintiff displayed a slower gait recently but found that this alone did not justify greater limitations, as there was no evidence to show this lasted or was expected to last at least 12 continuous months. In particular, plaintiff had full motor strength on examinations, and she had been able to maintain a job at Goodwill. Plaintiff's representative argued that, because the job was at Goodwill, plaintiff received accommodations. However, plaintiff did not testify to any accommodations at the job,

and Goodwill's status as a non-profit did not bestow accommodated employment status on every job there.  (Tr. at 40.)

Turning to the opinion evidence, the ALJ gave little weight to the opinions of the agency medical consultants, Drs. Walcott and Chan, who determined that plaintiff's physical impairments were not severe.  The ALJ found these opinions inconsistent with the objective medical evidence, including evidence adduced at the hearing level not available to the consultants.  That evidence showed a history of musculoskeletal impairments supporting a limitation to light exertion.  (Tr. at 40.)

After plaintiff's foot surgeries, podiatrist Dr. Lanier indicated that plaintiff could return to work with reduced squatting.  The ALJ gave this opinion little weight, as it was vague and did not specify how much sitting, standing, or walking plaintiff could do.  Moreover, he did not cite any particular evidence as the basis for his opinion.  (Tr. at 40.)

Dr. Zhou, the rheumatologist, "agreed" plaintiff was disabled.  The ALJ gave this opinion little weight, as Dr. Zhou had examined plaintiff only twice and did not offer specific functional limitations or cite to any record evidence as to why he believed plaintiff was disabled. (Tr. at 40.)

The ALJ gave some weight to the hearing testimony of plaintiff's sister, who indicated that plaintiff was in pain every day, she had to help plaintiff wash her back due to reaching limitations, and plaintiff had to reduce her hours at work because of her ongoing problems.  The ALJ credited this testimony to the extent it was consistent with a limitation to light exertion.  However, physical examinations did not support greater limitations.  Moreover, contrary to this testimony (and the representative's assertion that

plaintiff reduced her hours at work over the past two years), earnings records indicated that plaintiff earned more in 2017 and 2018 than she did in 2015 and 2016.  (Tr. at 40.)

Psychologically, plaintiff testified that she was always sad.  She stated that she stays in bed and cries until she falls asleep.  She further testified that she was anxious and sometimes yelled and swore at other people.  She was too anxious to drive, she testified.  (Tr. at 41.)

The ALJ noted that although plaintiff testified to significant mental health problems, the evidence was not particularly consistent with these allegations.  In 2015 and 2016, she told Dr. Duffy that she was depressed and anxious.  However, she did not undergo any formal psychiatric evaluations.  On November 3, 2015, plaintiff was noted to be cooperative with an appropriate mood and affect.  Dr. Duffy noted she was "doing reasonably well at this time."  On February 2, 2016, plaintiff said she "think[s] she is doing very well right now."  (Tr. at 41.)

On July 8, 2016, at a diabetes management session, plaintiff told a dietician that she was worried about returning to work and wanted a referral to a psychiatrist.[10] However, at her next appointment on October 17, 2016, plaintiff did not want to see a psychiatrist anymore because she was feeling much better after going back to work.  On November 4, 2016, plaintiff's mental status was appropriate, and she told Dr. Duffy she felt she was doing better, although her "coping skills are marginal."  (Tr. at 41.)  Similarly, on May 19, 2017, plaintiff said her mental status was "much better since she got a full-time job."  (Tr. at 41.)

---

[10] It appears this session occurred on July 18, 2016, not July 8, 2016.  (Tr. at 507.)

Plaintiff presented for a psychiatric consultative exam on August 8, 2017, describing crying spells and angry outbursts. Her mental status was unremarkable, as she was cooperative, able to concentrate and pay attention, and had adequate short-term memory. The examiner, Dr. Krawiec, gave a diagnosis of unspecified depressive disorder. (Tr. at 41.)

When plaintiff saw Nurse Practitioner Miller on July 13, 2018, she had normal mental status. On November 16, 2018, plaintiff said she had changed job duties, and it was "less stressful." She had a prescription for Cymbalta, an antidepressant, but her mental status was normal. (Tr. at 41.)

The ALJ found this evidence suggestive of a medically determinable impairment of depression and anxiety. However, because plaintiff had no specialized psychiatric treatment and told her providers she was generally doing well, there was no support for her allegations of debilitating depression and anxiety. Although recent evidence showed plaintiff took an antidepressant, her providers noted nothing abnormal about her mental status. (Tr. at 41.)

Accordingly, the ALJ concluded that plaintiff had moderate limitations in understanding, remembering, or applying information; concentrating, persisting or maintaining pace; and adapting or managing oneself. This caused functional limitations, including a limitation to simple, routine tasks; work with no more than occasional and minor changes in the work setting; and work that does not required considerable self-direction or multitasking. The ALJ found that plaintiff could work at an average work pace, but not at a significantly above average or highly variable pace. (Tr. at 41.)

As for the opinion evidence regarding plaintiff's mental impairments, the ALJ gave little weight to the opinions of the agency psychological consultants, Drs. Jennings and Harris, who determined that plaintiff's mental impairments were not severe. (Tr. at 41-42.) They did not have access to the entire medical record, which showed some ongoing treatment for depression and anxiety. Although plaintiff told her physicians she was doing well regarding her mental state, the evidence was sufficient to establish these conditions as severe within the meaning of the regulations. (Tr. at 42.)

The ALJ gave some weight to Dr. Krawiec's opinion. He wrote that plaintiff had adequate abilities to concentrate, pay attention, understand, and remember information. However, the opinion was vague, and the evidence showed plaintiff had some symptoms of depression and anxiety, which justified the mental limitations set forth in the RFC. (Tr. at 42.)

The ALJ concluded that although plaintiff testified to significant functional limitations, objective evidence showed only minor abnormalities. Additionally, despite these physical and mental impairments, plaintiff was able to earn more than $12,000 in both 2017 and 2018. (Tr. at 42.)

Given this RFC, the ALJ concluded at step four that plaintiff could perform her past relevant work as a garment sorter and merchandiser (as actually performed). (Tr. at 42.) In the alternative, the ALJ found at step five that plaintiff could also perform other jobs existing in significant numbers in the national economy. (Tr. at 42.) The ALJ credited the testimony of the VE that a person like plaintiff could work as an office helper and mail clerk. (Tr. at 43.) The ALJ accordingly found plaintiff not disabled. (Tr. at 43-44.)

Plaintiff requested review by the Appeals Council, but the Council declined (Tr. at 1), making the ALJ's decision the final word from the Commissioner for purposes of judicial review.  See 20 C.F.R. § 404.981.  Plaintiff then filed this action.

## II.  DISCUSSION

### A.    Standard of Review

The court reviews "an ALJ's decision to determine if it is supported by substantial evidence—evidence a reasonable mind might accept as adequate to support a conclusion." Lothridge v. Saul, 984 F.3d 1227, 1232 (7th Cir. 2021).  The court will not, under this deferential standard, re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ.  Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021).  In rendering his decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence presented.  Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012).  And on review, the court reads the decision as a whole and with common sense in determining whether the ALJ considered the relevant evidence, made the required determinations, and gave supporting reasons for his conclusions.  See, e.g., Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015); Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000).

### B.    Plaintiff's Claims

#### 1.    Credibility Assessment

Plaintiff first challenges the ALJ's credibility assessment.  (Pl.'s Br. at 5.)  As indicated above, the ALJ acknowledged that he was required to consider plaintiff's alleged symptoms and the extent to which those symptoms could reasonably be accepted as

consistent with the objective medical evidence and other evidence. (Tr. at 38, citing 20 C.F.R. § 404.1529, SSR 16-3p.) The ALJ further acknowledged the required two-step test, under which he first had to determine whether plaintiff suffered from a medically determinable impairment that could reasonably be expected to produce her alleged symptoms. Second, if plaintiff had such an impairment, the ALJ had to evaluate the intensity and persistence of the symptoms to determine the extent to which they limited plaintiff's work-related abilities.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 SSR LEXIS 4, at *26. The ALJ may consider several factors in making his determination, including objective medical evidence and any inconsistencies between the allegations and the record. Zoch v. Saul, 981 F.3d 597, 601 (7th Cir. 2020); see also Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007) (noting that a claimant's "subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record"). The court reviews an ALJ's credibility finding deferentially, reversing only if it is "patently wrong." Zoch, 981 F.3d at 601.

Plaintiff contends that, after setting out the two-step credibility test, the ALJ merely relied on the condemned "not entirely consistent" template language to complete the assessment. (Pl.'s Br. at 5.) She cites Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010), where the court called such language "meaningless boilerplate." But plaintiff overlooks the later Seventh Circuit cases explaining that the use of such templates is harmless

when the language "is followed by an explanation for rejecting the claimant's testimony." Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013) (citing Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012)); see also Lacher v. Saul, 830 Fed. Appx. 476, 478 (7th Cir. 2020) ("[T]he phrase 'not entirely credible' (or 'not entirely consistent') is meaningless only when the ALJ gives no legitimate reasons for discrediting the claimant's testimony.").

As indicated above, in this case the ALJ followed the template with a detailed discussion of the record, pointing out various inconsistencies between plaintiff's allegations and the medical and other evidence. For instance, the ALJ contrasted plaintiff's claimed limitations in standing and walking with her reported improvement following foot surgeries, the exam findings of generally normal gait and full strength, and her ability to maintain employment at Goodwill (including full-time work for a portion of the period at issue). The ALJ also noted that, contrary to plaintiff's claim that her condition had worsened, she earned more in 2017 and 2018 than in 2015 and 2016. Plaintiff's assertion that the ALJ made no attempt at providing specific reasons is simply wrong. (Pl.'s Br. at 8; Pl.'s Rep. Br. at 2.) Plaintiff also notes that a claimant's statements cannot be rejected simply because they lack objective medical support (Pl.'s Br. at 8; Pl.'s Rep. Br. at 2), but she develops no argument that the ALJ violated that rule here. See Vang v. Saul, 805 Fed. Appx. 398, 403 (7th Cir. 2020) (noting that perfunctory and undeveloped arguments are waived) (citing M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, 845 F.3d 313, 321 (7th Cir. 2017)). In any event, the ALJ's decision shows that he considered a variety of factors, not just the objective medical evidence.

Plaintiff argues that the ALJ failed to lay out all of her primary symptoms, instead providing a cursory discussion. (Pl.'s Br. at 6-7.) However, an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence. Pepper, 712 F.3d at 362; see also Gedatus v. Saul, 994 F.3d 893, 901 (7th Cir. 2021) (noting that "summaries are appropriate"). Nor is an ALJ required to explain the specific weight given to each allegation a claimant makes. See Shideler, 688 F.3d at 712 (noting that "an ALJ's credibility findings need not specify which statements were not credible").

In any event, plaintiff fails to explain how she was harmed by the ALJ's summary. Plaintiff discusses her complaints of hand numbness and pain (Pl.'s Br. at 6), but the ALJ restricted her from constant fine and gross manipulation and found her incapable of forceful grasping or torqueing. Plaintiff also notes her complaints of left elbow dysfunction, but the ALJ restricted her to only occasional reaching overhead with the left arm. Plaintiff mentions the tender points and widespread pain noted during exams (Pl.'s Br. at 7), but the ALJ acknowledged these findings in discussing Dr. Zhou's records. Finally, plaintiff notes her testimony of concentration problems (Pl.'s Br. at 7), but the ALJ partially credited that testimony in formulating an RFC for work that required no multitasking or considerable self-direction. Absent some indication that further limitations were required, any omission in cataloging the symptoms was harmless.

Plaintiff accuses the ALJ of providing a one-sided view of the evidence (Pl.'s Br. at 7), but she fails to identify any "line of evidence" the ALJ ignored. See Deborah M., 994 F.3d at 788 (explaining that an ALJ need not discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability). Moreover, plaintiff overlooks the fact that the ALJ accepted several of her

contentions, finding her far more limited than did the agency medical and psychological consultants, all of whom concluded that plaintiff's impairments were non-severe. To note a few examples, plaintiff testified that "I can't reach above my head that well with my left hand or my left arm" (Tr. at 102), and the ALJ included a limitation of no more than occasional reaching overhead with her left upper extremity. Plaintiff also testified that she could only concentrate on one thing a time and could not handle being told to do multiple things at one time, and the ALJ restricted her from jobs involving multitasking. And the ALJ accounted for plaintiff's foot complaints by limiting climbing and ambulation on uneven terrain.

In reply, plaintiff contends that the ALJ went out of his way to avoid finding her fibromyalgia a severe impairment and consequently never addressed her symptoms related to this impairment. (Pl.'s Rep. Br. at 2.) But that is incorrect; as summarized above, the ALJ discussed plaintiff's fibromyalgia and related symptoms at various points in his decision.[11] Indeed, as plaintiff acknowledges on the next page of her brief, the ALJ discussed the treatment notes in which Dr. Zhou documented plaintiff's report of intermittent widespread pain, the exam findings of positive tender points, and the treatment attempted for this condition. (Pl.'s Rep. Br. at 3, citing Tr. at 39.)

Plaintiff compares her case to <u>Gerstner v. Berryhill</u>, 879 F.3d 257, 264-65 (7th Cir. 2018) (Pl.'s Rep. Br. at 3-4), but the ALJ in that case erred in various respects: misunderstanding the nature of fibromyalgia and the extent to which it can be measured with objective tests, unjustifiably concluding that the claimant's pain was not disabling

---

[11] I address below plaintiff's argument that the ALJ erred by not specifically including fibromyalgia in the list of severe impairments.

because a doctor recommended exercise, and relying on the absence of treatment without considering the claimant's explanation that she lacked insurance. The ALJ did not make those mistakes here.

The ALJ in Gerstner also improperly relied on the claimant's job search, which, "on its own, is not evidence that she embellished her pain, because a claimant who looks for work after claiming a painful disability may have 'a strong work ethic or overly-optimistic outlook rather than an exaggerated condition.'" Id. at 265 (citing Ghiselli v. Colvin, 837 F.3d 771, 778 (7th Cir. 2016); Hill v. Colvin, 807 F.3d 862, 868 (7th Cir. 2015)). In the present case, the ALJ relied on the fact that plaintiff actually worked, including full-time employment for part of the relevant period and with her earnings increasing in 2017 and 2018 despite the claim that her condition was worsening. The ALJ also cited evidence that plaintiff's mental status improved after she got a full-time job. (Tr. at 41.) While this does not necessarily defeat plaintiff's claim, cf. Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working."), it was certainly evidence the ALJ could consider. See Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) (finding that the ability to perform even part-time work cut against the claimant's statement that he was totally disabled).

Plaintiff claims that the ALJ failed to acknowledge that Goodwill is a non-profit corporation focusing on work training and accommodation (Pl.'s Rep. Br. at 4), but that is also incorrect. Plaintiff's representative argued that because plaintiff's job was at Goodwill she received accommodations, but the ALJ noted that plaintiff did not at the hearing "testify as to any accommodations at the job, and Goodwill's status as a non-

profit organization does bestow accommodated employment status on every job there."
(Tr. at 40.)

Plaintiff also contends in reply that ALJ made no credibility finding as to why Dr. Zhou's findings were inconsistent with the medical evidence. (Pl.'s Rep. Br. at 3.) To the extent plaintiff intends this as an attack on the ALJ's evaluation of Dr. Zhou's opinion, the argument fails. As indicated above, the ALJ acknowledged Dr. Zhou's diagnosis of fibromyalgia but gave little weight to the doctor's conclusory statement that plaintiff was disabled. (Tr. at 40.) Plaintiff did not in her main brief argue that the ALJ erred in his evaluation of Dr. Zhou's opinion, and arguments made for the first time in reply are waived. See Brown v. Colvin, 661 Fed. Appx. 894, 895 (7th Cir. 2016) (citing Nationwide Ins. Co. v. Cent. Laborers' Pension Fund, 704 F.3d 522, 527 (7th Cir. 2013)). In any event, the ALJ gave sound reasons for discounting this opinion: Dr. Zhou examined plaintiff only twice and did not offer specific functional limitations or cite to any record evidence as to why plaintiff was disabled. See Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016) (noting that an ALJ need not accept a doctor's conclusory statement that the claimant is disabled or unable to work); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (holding that ALJ acted within his discretion in rejecting an opinion "as conclusory and unsupported by the evidence"); 20 C.F.R. § 404.1527(c) (directing an ALJ to consider the frequency of examination and the amount of supporting evidence a medical source provides in support of the opinion). Plaintiff offers a long string cite from the record in support of Dr. Zhou's opinion, but Dr. Zhou did not marshal this evidence (some of which predates the fibromyalgia diagnosis and pertains to plaintiff's foot problems, e.g., Tr. at 604, 676, 678, 680) in support of the opinion.

In sum, the ALJ's decision shows that he took plaintiff's subjective claims seriously, despite the lack objective medical support, crafting a detailed RFC specifically addressing her claims. That discussion touched on the pertinent regulatory factors, including the objective medical and opinion evidence, the nature and efficacy of the treatment plaintiff received, and plaintiff's activities. See 20 C.F.R. § 404.1529(c)(3). I find no reversible error in the ALJ's symptom evaluation.

**2. CPP**

Plaintiff next argues that the ALJ failed to incorporate her "moderate" limitation in concentration, persistence, and pace ("CPP") into the RFC and the hypothetical question he posed to the VE. (Pl.'s Br. at 8.) The Seventh Circuit has held "that 'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019) (quoting Varga v. Colvin, 794 F.3d 809, 813 (7th Cir. 2015)). While the ALJ need not use any "magic words," he "must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." Id. (quoting Moreno v. Berryhill, 882 F.3d 722, 730 (7th Cir. 2018)). And when it comes to the RFC finding, the Seventh Circuit has likewise underscored that the ALJ generally may not rely merely on catch-all terms like "simple, repetitive tasks" because there is no basis to conclude that they account for problems of concentration, persistence or pace. Id. That a person can perform simple and repetitive tasks says nothing about whether she can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift. Id.

As discussed above, at steps two and three of the evaluation process the ALJ found that plaintiff had a moderate limitation in CPP.  He then stated: "The residual functional capacity considers this with a limitation to work that does not require multitasking, and work at an average production pace but not a significantly above average or highly variable pace."  (Tr. at 37.)  Later in his decision, the ALJ explained that based on plaintiff's moderate limitations in understanding, remembering, or applying information; concentrating, persisting or maintaining pace; and adapting or managing oneself, the RFC included limitations to simple, routine tasks; work with no more than occasional and minor changes in the work setting; and work that does not required considerable self-direction or multitasking.  He further found that plaintiff could work at an average work pace, but not at a significantly above average or highly variable pace.  (Tr. at 41.)

Plaintiff argues that these limitations are insufficient, citing the statement in Crump than an ALJ generally may not rely on catch-all terms like "simple, repetitive tasks."  (Pl.'s Br. at 10.)  But the ALJ did not make that mistake here.  The ALJ included a limitation to simple, routine tasks to account for plaintiff's moderate limitation in understanding, remembering, or applying information, then further tailored the RFC to account for the CPP limitation by restricting plaintiff from work requiring multitasking and finding that she could work at an average production pace but not a significantly above average or highly variable pace.  As discussed above, the ALJ partially credited plaintiff's own testimony in adopting an RFC more restrictive than the consultants' proposed.  However, the ALJ rejected claims of more significant mental problems, noting the absence of specialized psychiatric treatment, the notations that plaintiff's mental health improved after she

returned to work (with her status "much better" after she started full-time employment), and Dr. Krawiec's findings that plaintiff was able to concentrate and pay attention and had adequate short-term memory. (Tr. at 41.) "In sum, this is not a case in which the ALJ merely assumed, without meaningfully engaging with the evidence, that an RFC for simple work would accommodate plaintiff's CPP restrictions." Thompson v. Saul, 470 F. Supp. 3d 909, 930 (E.D. Wis. 2020).

Plaintiff notes that the Seventh Circuit has rejected undefined restrictions from "fast paced production requirements" as a means of addressing CPP limitations. (Pl.'s Br. at 10, citing Varga, 794 F.3d at 813-14.) But this case is more like Martin v. Saul, where the ALJ "tailored Martin's RFC to her CPP limitations without assuming that restricting her to unskilled work would account for her mental health impairments."

> Start with concentration. The . . . ALJ found that "[Martin] could maintain the concentration required to perform simple tasks, remember simple work-like procedures, and make simple work-related decisions." Moving to persistence, the ALJ, in defining and tailoring the RFC, further determined that Martin could stay on-task and thereby "meet production requirements." Of course, even if someone is on-task, it is still possible she may operate at such a slow pace that an employer would not find her work satisfactory. Hence, the second "P"—pace—must enter the equation. The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented. Ideally, the ALJ would have brought to the surface what is surely implicit in the determination—that any pace-based goals must be reasonable as a way of signaling that the employer could not set the bar beyond the person's functional reach. We take comfort here from the fact that the jobs the vocational expert suggested inherently reflected such a reasonableness limitation. Although Martin complains that the pace requirements are too vague, there is only so much specificity possible in crafting an RFC. The law required no more.

950 F.3d 369, 374 (7th Cir. 2020).

Here, after considering plaintiff's statements, the records of her primary care physician, and the findings of the psychological consultative examiner, the ALJ found that

plaintiff had a moderate limitation in understanding and remembering information and thus should be restricted to simple, routine tasks. In considering persistence and pace, the ALJ found that plaintiff could sufficiently stay on-task to work at an average pace but should not be required to work at a significantly above average or highly variable pace, nor should she be required to multi-task or perform work requiring considerable self-direction. As in Martin, the ALJ tailored the RFC to match plaintiff's specific limitations.

But even if the ALJ should have said more, any error was harmless, as plaintiff fails to show that additional limitations were warranted. See Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019) ("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless. It is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none.") (internal citation omitted). Plaintiff contends, without elaboration, that: "The evidence demanded additional RFC restrictions of the inability to maintain CPP for a 2-hour segment, even in an unskilled full-time employment environment, and that she would be off task over 10 percent of the workday."[12] (Pl.'s Br. at 11.)

Plaintiff cites no evidence supporting such restrictions. Ordinarily, claimants making CPP arguments rely on reports from the agency psychological consultants endorsing various "moderate" limitations in the "worksheet" section, e.g., in "the ability to maintain attention and concentration for extended periods of time." See, e.g., DeCamp v. Berryhill, 916 F.3d 671, 676 (7th Cir. 2019); Hoeppner v. Berryhill, 399 F. Supp. 3d 771, 777-78 (E.D. Wis. 2019). In the present case, however, the consultants found only "mild"

---

[12] In reply, plaintiff adds to the attached quote that the limitations would be "mainly due to pain." (Pl.'s Rep. Br. at 7.) However, she again cites no evidence in support.

limitations at step two (Tr. at 128-29, 140-41); they accordingly deemed the mental impairments non-severe and did not complete the mental RFC "worksheet" containing the limitations commonly cited in support of CPP arguments.

As indicated above, the ALJ gave little weight to the opinions of the agency consultants in this case, finding that the hearing level evidence demonstrated "severe" mental impairments. But plaintiff fails to explain how the ALJ's finding of a "moderate" CPP limitation at steps two and three would translate into the disabling limitations she posits. As the Seventh Circuit has explained: "A 'moderate limitation' is defined by regulation to mean that functioning in that area is 'fair.'" Pavlicek v. Saul, 994 F.3d 777, 783 (7th Cir. 2021) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1)). In ordinary usage, "fair" does not mean "bad" or "inadequate." Id. Accordingly, a moderate CPP limitation "seems consistent with the ability to perform simple, repetitive tasks at [an average work] pace." Id.[13]

The ALJ also partially credited the report from Dr. Krawiec, who found that plaintiff had no mental impairment that would interfere with her being able to concentrate, persist,

---

[13] In reply, plaintiff argues that this part of the decision in Pavlicek is dicta (Pl.'s Rep. Br. at 6), but that is incorrect. See Wilder v. Apfel, 153 F3d 799, 803 (7th Cir. 1998). Plaintiff cites my decision in Miller v. Saul, No. 19 C 305, 2020 U.S. Dist. LEXIS 39491, at *19 n.1 (E.D. Wis. Mar. 2020), in which I stated that a revision to the regulation governing the evaluation of mental impairments did not impact the Seventh Circuit's CPP caselaw. But in Miller I was talking about a different regulatory change (pertaining to the functional areas under paragraph B), not the regulation defining the term "moderate." Plaintiff further argues in reply that Pavlicek is distinguishable because in that case the ALJ relied on the opinions of agency doctors who translated the moderate limitations in CPP from the checklist portions of their reports into an RFC assessment. In this case, conversely, the ALJ did not rely on the psychological consultants. (Pl.'s Rep. Br. at 7.) But that difference does not help plaintiff. As indicated above, because the consultants found plaintiff's mental impairments non-severe, they did not complete the checklist/worksheet; accordingly, plaintiff cannot rely on that evidence in support of her CPP argument. Cf. DeCamp, 916 F.3d at 676.

and maintain pace, and indicated that she displayed no notable difficulty with attention, concentration, or memory during the exam. Plaintiff cites no medical evidence or opinion supporting time off task or any other limitations related to CPP. See Karr v. Saul, 989 F.3d 508, 513 (7th Cir. 2021) ("Karr bears the burden of proving that she is disabled[, and] she has failed to muster the evidence to prove her alleged disability and entitlement to disability benefits.").

In reply, plaintiff argues that the ALJ erred by relying on the normal mental status exams, as a person's ability to concentrate in a doctor's office does not necessarily mean she can do so in a competitive work environment. (Pl.'s Rep. Br. at 5, citing Crump, 932 F.3d at 571.) But the ALJ also cited evidence that plaintiff's mental status improved after she returned to work. Indeed, she told a provider in 2017 that her depression and anxiety were "much better since she got a full-time job." (Tr. at 41, quoting Tr. at 705.)

Plaintiff further argues in reply that the ALJ ignored her problems maintaining attention and concentration because of chronic pain, including another lengthy string cite from the record. (Pl.'s Rep. Br. at 5.) However, she fails to specifically explain why any of this evidence compelled the ALJ to include additional CPP-related limitations. See Kujawski v. Colvin, No. 11 C 3551, 2014 U.S. Dist. LEXIS 82108, at *23 (N.D. Ill. June 17, 2014) ("If there is evidence in those pages to prove [the plaintiff's claim], it is incumbent upon him to cite it specifically. Judges are not pigs, nosing about for truffles in briefs.") (internal citation omitted). In the portion of the hearing transcript plaintiff cites, counsel asked: "Please tell the Judge what difficulties you have with concentration or focus?" (Tr. at 103.) Plaintiff responded: "I can only concentrate on one thing at a time,

but if I get told multiple things to do at one time, I can't do it."  (Tr. at 103.)  As indicated above, the ALJ specifically accounted for this limitation in the RFC.

Plaintiff also argues in reply that her case is like Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009), where (she contends) the court found that chronic pain from the claimant's combined impairments required RFC limitations because of the resulting impairment in CPP.  (Pl.'s Rep. Br. at 5-6.)  But the Simila court affirmed the ALJ's decision, rejecting the claimant's arguments that the ALJ should have found a greater limitation in CPP, 573 F.3d at 515, and that the ALJ erred in discounting his statements regarding the severity of his pain, id. at 517.   Simila does not help plaintiff.

In sum, the ALJ considered the relevant evidence and specifically tailored the RFC to account for plaintiff's mental limitations.   Plaintiff cannot establish reversible error based on the ALJ's consideration of the CPP issue.

### 3.     Impairments in Combination

Finally, plaintiff argues that the ALJ failed to consider the combined effect of all impairments, severe and non-severe, on her ability to work.  (Pl.'s Br. at 11.)  "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment.  A failure to fully consider the impact of non-severe impairments requires reversal." Denton v. Astrue, 596 F.3d 419, 423 (7th Cir. 2010) (internal citations omitted); see also Spicher v. Berrylhill, 898 F.3d 754, 759 (7th Cir. 2018) ("When assessing if a claimant is disabled, an ALJ must account for the combined effects of the claimant's impairments, including those that are not themselves severe enough to support a disability claim.").

As indicated above, at step two the ALJ determined that plaintiff had the following severe impairments: disorders of the muscles and fascia, obesity, depression, and anxiety. He found plaintiff's diabetes non-severe and that rheumatoid arthritis was not a medically determinable impairment. The ALJ further noted that in assessing RFC he considered all medically determinable impairments, including those that were not severe. (Tr. at 35.)

Plaintiff argues that the ALJ failed to find her idiopathic peripheral neuropathy ("IPN") and her fibromyalgia to be severe impairments, and also failed to include any limitations from these impairments in the RFC assessment. (Pl.'s Br. at 12; Pl.'s Rep. Br. at 8.) Plaintiff states that IPN is an illness affecting sensory and motor nerves, which may cause paresthesia, numbness, and pain in the hands and feet. As the disease progresses, patients may experience balance problems and difficulty walking on uneven surfaces. (Pl.'s Br. at 12; Pl.'s Rep. Br. at 8, citing Johns Hopkins website.) Plaintiff indicates that she was diagnosed with IPN in May 2015, and the neuropathy manifested as numbness in her feet, confirmed by EMG testing, resulting in an impaired ability to stand and walk. She contends that this impairment should have resulted in a sedentary RFC. (Pl.'s Br. at 13.)

Plaintiff states that fibromyalgia is a disorder characterized by widespread pain accompanied by fatigue, sleep, memory, and mood issues. It may also include a symptom referred to as "fibro fog" impairing the person's ability to focus, pay attention, and concentrate on tasks. (Pl.'s Br. at 13; Pl.'s Rep. Br. at 9, citing Mayo Clinic discussion of fibromyalgia.) Plaintiff asserts that in her case rheumatologist Dr. Zhou diagnosed her

with fibromyalgia in November 2016.[14] She further contends that, while the ALJ acknowledged the diagnosis, he failed to find the impairment severe and failed to provide any limitations in the RFC for what Dr. Zhou deemed a "significant functioning impairment." She concludes that the ALJ should have included restrictions in sitting, standing, walking, postural movements, fingering, lifting, and carrying, resulting in a sedentary RFC and a finding of disability. (Pl.'s Br. at 14.)

Plaintiff's focus on the specific conditions the ALJ included in the list of severe impairments at step two is misplaced. "Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment." Gentle, 430 F.3d at 868. Accordingly, as courts have noted, an ALJ's failure to find a particular impairment severe at step two is harmful only if it causes the ALJ to omit work-related limitations from the RFC. See Curvin, 778 F.3d at 649; Castile v. Astrue, 617 F.3d 923, 927 (7th Cir. 2010); Masch v. Barnhart, 406 F. Supp. 2d 1038, 1054 (E.D. Wis. 2005); see also Niemer v. Saul, No. 19-CV-627, 2020 U.S. Dist. LEXIS 18773, at *6-7 (E.D. Wis. Fed. 5, 2020) ("So long as the ALJ properly considered all of Niemer's alleged disabling symptoms in formulating the RFC, it matters little which impairment the symptoms stemmed from."). And as courts have also noted, that a condition often causes certain symptoms does not mean that a given claimant with that condition suffers from those symptoms, much less that her symptoms are of disabling severity. See Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005); Vazquez v. Barnhart, No. 17-C-1763, 2018 U.S. Dist. LEXIS 240169, at

---

[14] Plaintiff is wrong about the timing. While Dr. Duffy's records from November 2016 reference fibromyalgia (Tr. at 386), plaintiff did not see Dr. Zhou until January 2019 (Tr. at 728).

*55 (E.D. Wis. Oct. 25, 2018); see also Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007) ("[T]he existence of these diagnoses and symptoms does not mean the ALJ was required to find that Skinner suffered disabling impairments.").

Here, the ALJ discussed plaintiff's neuropathy and fibromyalgia at several points in his decision. See Curvin, 778 F.3d at 650 (noting that the court reads an ALJ's decision as a whole and will not discount discussion of an issue because of its location in the decision). The ALJ acknowledged that an EMG showed neuropathy, but it was mild. (Tr. at 35.) The ALJ also acknowledged the diagnosis of fibromyalgia based on Dr. Zhou's examinations but noted that plaintiff was nevertheless able to ambulate effectively and experienced no chronic reductions in the use of the hands or upper extremities. (Tr. at 36.) Later, in discussing RFC, the ALJ again noted the history of fibromyalgia, but the evidence showed that plaintiff had few physical limitations related to this condition, with the exams generally showing a normal gait. (Tr. at 39-40.) Nevertheless, the ALJ included limitations of minimal ambulation on uneven terrain, occasional climbing and postural movements, and frequent (not constant) use of the hands with no forceful grasping. (Tr. at 40.) Plaintiff fails to demonstrate that the evidence required greater limitations.

As discussed above, the ALJ also considered Dr. Zhou's statement that he agreed with disability but gave it little weight, as Dr. Zhou examined plaintiff only twice,[15] offered no specific functional limitations, and cited no record evidence in support. (Tr. at 40.) These are valid reasons for discounting a medical opinion, see, e.g., Loveless, 810 F.3d

---

[15] Indeed, as the ALJ noted at the hearing, Dr. Zhou agreed plaintiff was disabled at their very first appointment. (Tr. at 107.)

at 507; 20 C.F.R. § 404.1527(c), and plaintiff develops no argument to the contrary.   She contends in reply that the ALJ turned a blind eye to Dr. Zhou's opinion (Pl.'s Rep. Br at 10), but she fails to even acknowledge, must less contest, the reasons given by the ALJ for discounting that opinion.

Plaintiff also argues in reply that the Commissioner did not address the ALJ's failure to consider her "Bilateral metatarsal impairments . . . as a severe or non-severe impairment."  (Pl.'s Rep. Br. at 9.)  Plaintiff did not raise this issue in her main brief, so it is unsurprising that the Commissioner did not address it in response.   The argument is waived.  <u>See</u> <u>Brown</u>, 661 Fed. Appx. at 895.   In any event, the ALJ fully considered plaintiff's various foot impairments and the treatment she received for them, finding that she retained the capacity for light work with minimal ambulation on uneven terrain and occasional climbing.  (Tr. at 39.)  Plaintiff includes another long string cite from the record, but she does not specifically explain why any of that evidence required the ALJ to limit her to sedentary work.  (<u>See</u> Pl.'s Rep. Br. at 9.)

In sum, the ALJ adequately considered the limitations arising from all of plaintiff's impairments, regardless of the label.   Plaintiff cannot establish reversible error on this ground.

## III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of August, 2021.

<u>/s/ Lynn Adelman</u>
LYNN ADELMAN
District Judge